# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### FT. MYERS DIVISION

**SCHOOL BOARD OF LEE COUNTY, FLORIDA,**

                  **Plaintiff,**

**vs.**                                                 **Case No.  2:06-cv-198-FtM-29DNF**

**E.S., individually, and on behalf of B.S., a minor,**

                  **Defendants.**

**and**

**E.S., individually, and on behalf of B.S.,a minor,**

                  **Third Party Plaintiffs,**

**vs.**

**TERRY ANDREWS, individually, and ELAINE FORD, individually,**

                  **Third Party Defendants.**

_____/

## REPORT AND RECOMMENDATION

**TO THE UNITED STATES DISTRICT COURT**

      This action was filed pursuant to the Individuals with Disabilities Act ("IDEA"), 20 U.S.C. 1400 *et seq*. by the Plaintiff, the School Board of Lee County, Florida ("School Board").  The Defendants, E.S., (the "Parent") individually and behalf of B.S. (the "Child") filed a Counterclaim and Third Party Complaint (Doc. 11) pursuant to the IDEA, the related Florida Statutes, and the civil rights

statutes. The School Board asserts that it was adversely affected by certain portions of the Final Order dated March 17, 2006, and seeks *de novo* review of the Final Order pursuant to 20 U.S.C. §1415(i)(2)(A). The Parent and Child claim that the Child was denied a free and appropriate public education ("FAPE") which violates the IDEA and Florida Statutes, and that Third-Party Defendants Terry Andrews, Elaine Ford, and the School Board violated the Plaintiffs' procedural due process rights.[1]

Pursuant to the IDEA and the companion Florida Statutes[2], the School Board must provide the Child with FAPE. *M.M. v. School Board of Miami-Dade County*, 437 F.3d 1085, 1095 (11th Cir. 2006). Integral to the concept of an "appropriate" education is that notion that the services provided must be tailored to serve the individual needs of the child and not the child's disability. *Id*. To insure that each child's individual educational needs are met, the school and parents work together to develop an individualized education program ("IEP"). *Id*. Under the IDEA, a child is not entitled to the best program available nor must a program maximize a child's potential. *Id*. at 1102. The educational program must be sufficient to provide the child with some educational benefit. *Id*. at 1103, (citing *JSK v. Hendry County Sch. Bd.,* 941 F.2d 1563, 1573 (11th Cir. 1991)).

---

[1] Pursuant to the IDEA Case Management Order (Doc. 13), the IDEA portion of the case is bifurcated from the alleged due process violations. Only those counts brought under the IDEA will be addressed in this Report and Recommendation.

[2] Section 230.23(4) of the Florida Statutes was enacted, and Rule 6A-6.03311 of the Florida Administrative code was promulgated to carry out the mandates of the IDEA. *See, In Interest of J.D.*, 510 So.2d 623, 627, nn. 2, 3 (Fla. 1st DCA 1987). Florida incorporated the federal guidelines in §1003.57 Fla. Stat., and Chapter 6A-6, Florida Administrative Code. *See, M.H. v. Nassau County School Bd.*, 918 So.2d 316 (Fla. 1st DCA 2005).

If the parents and school cannot agree on the contents of the IEP, either party may request a due process hearing. 20 U.S.C. §1415(f)[3].  In Florida, due process hearings are conducted by an administrative hearing officer of the Division of Administrative Hearings ("DOAH").  Fla. Stat. §230.23(4)(m)(5).  The burden of proof or persuasion at the administrative hearing lies with the party who is seeking relief.  *Schaffer v. Weast*, 546 U.S. 49, 126 S.Ct. 528, 537 (S.Ct. 2005), *M.M. v. School Board of Miami-Dade County, Florida*, 437 F.3d 1085, 1096, n. 8 (11th Cir. 2006).   In this case, the Parent was seeking relief from the May/June 2004 IEP.

"The Supreme Court has established a two-part test to determine whether a student has been denied a FAPE."  *Board of Education of Hendrick Hudson Central School District., Westchester County v. Rowley*, 458 U.S. 176, 206-207 (1982).  An ALJ must first determine whether the School Board has complied with the procedural requirements of the IDEA, and then the ALJ must determine whether the IEP was "reasonably calculated to enable the child to receive educational benefits."  *Id*. at 207.  If the ALJ determines that the School Board has complied with the IDEA's procedural requirements and the IEP does provide the child with necessary services, then the School Board has provided the child with FAPE.  *Id*.  The ALJ may also find that the School Board has failed to comply with the IDEA's procedural requirements.  *Id*.

The DOAH decision is a final order which entitles a party adversely affected to bring an action in either a federal district court or a state court of competent jurisdiction. Fla. Stat. §230.23(4)(m)(4), and 20 U.S.C. §1415(i)(2).  The District Court must give "due weight" to the decision of the ALJ, but

---

[3] The IDEA was amended in 2004, after the actions occurred in this case and after the request for a due process hearing.  The Court will cite to the pre-2004 version of the IDEA, however, the Court notes that nothing in the 2004 amendments appear to materially affect the decision in this case.  *See*, *Schaffer v. Weast*, 546 U.S. 49, 126 S.Ct. 528, 532 (2005).

the federal action is an independent action and not merely a review of the state administrative decision. *See, Rowley*, 458 U.S. at 206, *M.M.*, 437 F.3d at 1097.   The findings of fact by the ALJ are considered to be "prima facie correct" and if the District Court fails to adopt these findings of fact it must explain why. *M.M.*, 437 F.3d at 1097.   The District Court must also follow the Supreme Court's two-step analysis, first whether the School Board followed the procedural requirements of the IDEA, and second whether the proposed IEP provided the child with FAPE. *Id.* (citing *Rowley*, 458 U.S. at 206-207). If the District Court determines that the School Board has complied with the procedural requirements of the IDEA and the IEP provided the child with FAPE, then the inquiry ends. *Id.* If, however, the District Court determines that the School Board did not comply with the procedural requirements of the IDEA or that the IEP does not provide the child with FAPE, then the District Court "shall grant such relief as the court determines is appropriate." 20 U.S.C. §1412(a)(10)(C)(ii).   "The reviewing court has broad discretion in determining what is appropriate based on the circumstances of each case." *M.M.*, 437 F.3d at 1097-8, (citing *School Committee of Town of Burlington v. Department of Education of Massachusetts*, 471 U.S. 359, 365 (1985)).

### I. Procedural History

On March 17, 2006, the Administrative Law Judge Daniel Manry ("ALJ") entered a Final Order[4] and found the following:

> The challenged IEP is not reasonably calculated to provide Petitioner [the Child] with FAPE and does not adequately address Petitioner's unique educational needs.  Placement of Petitioner in DMS [Diplomat Middle School] pursuant to the challenged IEP is inappropriate, and continued placement in Heartspring is appropriate.

---

[4]  The Final Order is attached as an exhibit to the Complaint (Doc. 1).

(Final Order, p. 33).  The Final Order entered by the ALJ was not appealed.

The School Board filed its Complaint on April 12, 2006.  This action is the second action filed in this Court  involving these same parties.  In 2000, the Child and Parent filed an action, Case No. 2:00-cv-60-FtM-29 DNF asking for review of a Final Order entered by a different Administrative Law Judge.  The main issues in the prior case were the development of an appropriate IEP and the placement of the Child.  This Court recommended that the Child be placed in a residential program which would allow him to obtain educational benefit.   The District Court adopted the Report and Recommendation by Order (Doc. 90 in Case No. 2:00-cv-60-FtM-29DNF) on September 10, 2002, with supplementation and required the School Board to place the child in a residential program.  On October 28,  2003, the Eleventh Circuit affirmed the District Court's decision regarding placement in a residential facility[5].  (See, Doc.  141 in Case No. 2:00-cv-60-FtM-29DNF).

The Court received the record of the proceedings before DOAH, along with the Proposed Findings of Fact and Conclusions of Law submitted by both parties and their respective responses. (Docs. 33, 36, 38, 43)  The parties agreed to allow additional evidence in this case which included the depositions of Terry Andrews and Robin Frink.  (See, Docs. 41 and 42).


## II.  Facts

The School Board of Lee County is an agency that operates, controls, and supervises all of the public schools in the School District of Lee County, Florida and receives state and federal funding, and therefore it subject to the requirements of the IDEA.  (Final Order, p. 3).  The Child was born on July

---

[5]  The case was remanded back to the District Court regarding the issue of attorney's fees.

3, 1990, and is enrolled in the School District of Lee County.  (Pet. A-3-1[6]).  The Child qualified for services under the IDEA based upon his exceptionalities of autism, and language impaired.  (Pet. A-3-1).  The child was diagnosed with autism, encephalopathy, dyspraxia, mild left scoliosis, and chronic allergic rhinitis.  (Pet. A-1-15, A-2-18).  Based upon the rulings in the prior federal case, the Child was enrolled at Heartspring on April 14, 2003 and an IEP was completed on July 8, 2003, which was not challenged.  (Pet. A-11).

It is undisputed that the Child made educational progress at Heartspring under the 2003 IEP.  (Final Order, p. 12).  The staff at Heartspring prepared an in depth draft of an Annual IEP on May 25, 2004, indicating the Child's present levels as well as the other requirements of an IEP.  (See, Pet. A-2-1 through 26).   Based upon this draft IEP, it shows that the Child progressed with his gross motor skills by walking on a treadmill for 14 minutes, learning to roller skate, beginning to swim, and learning to ride an adapted tricycle. (Pet. A-2-3).  When he arrived at Heartspring, he preferred to be wrapped in a blanket, and  refused to use his hands often sitting on them to avoid participation.  (Pet. A-2-5, A-2-11, Admin. Tr.[7] p. 480).  He was willing to use his hands only for self-injurious behavior and to occasionally take food.  (Admin. Tr. p. 480).   The Child needed hand-over-hand assistance to begin any activity.  (Pet. A-2-5).  At Heartspring, the Child learned to reach and grasp for objects and release and pick up objects, although at times he needed prompting.  (Pet. A-2-5).  When he arrived at Heartspring, the Child refused to eat with utensils, however, now he has accepted eating food with utensils, and is able to scoop food with a spoon and pierce bites of food with a fork with supervision.

---

[6]  "Pet." exhibits refer to the Petitioner's exhibits which are part of the records from the DOAH hearing.

[7]  "Admin. Tr." refers to the transcript of the Administrative Hearing held at DOAH.

(Pet. A-2-6).  His dressing capabilities have also advanced from requiring a great deal of assistance, to becoming more independent, if the clothing is in the correct orientation.  (Pet. A-2-6).  The Child continues to be dependent on aids for personal hygiene, but when he arrived at Heartspring he resisted bathing, but now he accepts it with hand-over-hand assistance.  (Pet. A-2-6).

The Child is capable of following a few simple commands such as "sit down," however he is inconsistent with verbal commands and better with visual cues.  (Pet. A-2-10).  When the Child does not respond to a command, he will do nothing, will attempt to leave, will have a tantrum, or will attempt to follow the direction but will do the wrong thing.  (Pet. A-2-10).  The learning process is slow.  (Pet. A-2-11).  The Child is nonverbal, but does make sounds and can say "no" but not at the appropriate times.  (Pet. A-2-11).  The Child will stare at an item, but it is difficult to determine if this is an item the Child wants.  (Pet. A-2-11).  The Child uses his hands to reach for an object, or for self-injurious behavior, but does not demonstrate that he is capable of understanding sign language. (Pet. A-2-12).  The staff at Heartspring found sign language not to be an appropriate system for the Child. (Pet. A-2-12).  The Child is able to communicate by using a picture symbol, but not consistently and there are many instances of self-injurious behavior and whining during these sessions. (Pet. A-2-12). The Child makes more accurate choices when the actual object is placed in front of him.  (Pet. A-2-12).

The Child's activity level has increased since arriving at Heartspring.  (Pet. A-2-15).  When he arrived he was lethargic and not aware of his environment.  (Pet. A-2-15).  The Child is now active. (Pet. A-2-15).  He walks from location to location, however, due to this new activity level, the Child also attempts to elope more frequently.  (Pet. A-2-15).  His elopement has increased since arriving at Heartspring from 7 times per day to over 20 times per day.  (Pet. A-2-25).  The staff at Heartspring recommends that the Child use the object/picture scheduling system they developed with the Child

which needs to be reinforced at school, during leisure activities, and at home. (Pet. A-2-15).  He needs structured activities at school and at home.  (Pet. A-2-15).

At Heartspring, the child is in a classroom with 7 other students.  (Pet. A-2-18).  The classroom has separate work areas for each student, and an individual schedule for each student. (Pet. A-2-18). The classroom has group, snack, break and computer areas.  (Pet. A-2-18).  The Child uses a picture system for his schedule, and is prompted when necessary to go to the location that matches the picture. (Pet. A-2-18).  When he completes the activity, he is given a break chip to go the break area.  (Pet. A-2-18).  His breaks are structured.  (Pet. A-2-18).  The child needs a staff member with him at all times during the day to keep him on schedule.  (Pet. A-2-18).  When the Child is being taught, the instructor is within 12 inches of him or else the Child will leave his seat and walk away or turn away. (Admin. Tr. p. 499-500).   In the classroom, the Child had incidents of aggression where he would scream, and then he would pinch or scratch.  (Admin. Tr. p. 503).   The Child also had problems with dropping (moving from one place to another and then stopping and lowering himself to the floor), elopement (leaving the area), masturbation, stripping, property destruction, and hitting of the ears to the point of tissue damage.  (Admin. Tr. p. 504-505, 511-513).  Even though there was a significant decrease in the ear hitting behavior, the Child continues to hit his ears.  (Admin. Tr. p. 513).  His ear hitting was over 6000 times per day when he arrived at Heartspring, and it decreased to over 2000 times per day in April/May 2004.  (Pet. A-2-15).

The Child lives in a group home at Heartspring.  (Pet. A-2-19).  Due to his problems with elopement, he has someone with him at all times.  (Pet. A-2-19).  His schedule at home is set up the same way as in the classroom.  (Pet. A-2-19).  The Child needs prompts to complete tasks, and needs

supervision to monitor his ear hitting.  (Pet. A-2-19).  The Child needs adult assistance to complete almost all of his daily routine.  (Pet. A-2-20).

At the administrative hearing, Kelly Denney who is an ESE teacher at Diplomat Middle School ("Diplomat") testified as to the classroom at Diplomat that the Child would be transferred to from Heartspring.  (Admin. Tr. p. 55).  Ms. Denny is certified in K through 12 for ESE.  (Admin. Tr. p. 56).  In her classroom in October 2004, she had six students and two aids.  (Admin. Tr. p. 56).  Ms. Denney observed the Child in September 2004 at Heartspring.  (Admin. Tr. p. 59).  The classroom is ESE autistic.  (Admin. Tr.[8] p. 69).  Diplomat has 1200 students enrolled at the school and less than 100 are ESE students.  (Admin. Tr. p. 70).  The classroom is located in the hallway with eighth grade classes.  (Admin. Tr. p. 71).

In the classroom is a large semi-circular table which is used for group work, speech work, and arts and crafts.  (Admin. Tr. p. 72).  There is also a separate area for coloring and art.  (Admin. Tr. p. 72).  The Child's schedule is posted on a partition.  (Admin. Tr. p. 72).  There are student desks in the front of the classroom, and each student has an assigned desk.  (Admin. Tr. p. 73).  The classroom has round tables in the back used mainly for cooking and eating snacks.  (Admin. Tr. p. 73).  The classroom also has three computers for the students.  (Admin. Tr. p. 73-74).  One computer program that the other students like talks to the students and  teaches them to type, helps them verbalize, and teaches them to spell.  (Admin. Tr. p. 74).  During the day, other students and teachers come into the room which is encouraged by Ms. Denney so that her students do have some distractions during the

_____

[8]  One of the exhibits at the Administrative Hearing is a videotape of Diplomat.  (The video tape is labeled "Diplomat Middle School, 04-4300E", and is Resp. Exh. 10, see Admin. Tr. p. 99).

day.  (Admin. Tr. p. 75).  Ms. Denney uses outside people to help her students communicate and socialize more.  (Admin. Tr. p. 76).

The students choose chores that are done weekly.  Some of the chores include vacuuming, wiping tables, doing laundry, sweeping, and making Kool-Aid.  (Admin. Tr. p. 90). If a student has an affinity towards water, the student may choose wiping tables and using squirt bottles.  (Admin. Tr. p. 90).

There is a laundry machine and dryer in the room.  (Admin. Tr. p. 76).  The students do laundry for the students who have violated the dress code and have to change into proper attire.  (Admin. Tr. p. 76).  A student from Ms. Denney's classroom accompanied by an adult  will take the laundry basket upstairs to the timeout room and gather the laundry.  (Admin. Tr. p. 77).  The student will socialize with the adult in the timeout room, and then bring the laundry back to the classroom to wash.  (Admin. Tr. p. 77).   Ms. Denney finds that by allowing students to leave the room for legitimate reasons, it teaches the students that there are rules and helps with the elopement problem.  (Admin. Tr. p. 78).  The students put the laundry in the washer, sometimes measure the soap, turn on the machine, take the laundry from the washer and put it in the dryer, take it out of the dryer, and fold it with an adult. (Admin. Tr. p. 78-9).  The classroom is equipped with a refrigerator, oven, stove, toaster oven, and coffeepot.  (Tr. p. 75, 79).   The room also has a sink which is used to wash dishes.  (Admin. Tr. p. 78).    The room is equipped with a bathroom.  (Admin. Tr. p. 80).  Ms. Denney uses the bathroom to achieve goals regarding hygiene.  (Admin. Tr. p. 89).  The bathroom is equipped with towels, soap and shampoo, and the students are permitted to shower there.  (Admin. Tr. p. 89).

There are red boxes in the room that contain work tasks.  (Admin. Tr. p. 80).  The student pulls his name from a bucket and puts his name tag on a task.  (Admin. Tr. p. 81).  The student then takes

the task to his desk, completes the task, and puts it back.  (Admin. Tr. p. 81).  Throughout the week, the students complete all the tasks in the various red boxes.  (Admin. Tr. p. 81).  Blue boxes are used for leisure time activities.  (Admin. Tr. p. 81).  Other leisure activities include musical instruments and theraputty (similar to Play-Doh). (Admin. Tr. p. 85).  One table has different types of media, such as dried kidney beans, water or sand, and the students are permitted to play, use measuring cups, and sift the media and often the  students are told to look for hidden objects.  (Admin. Tr. p. 86-87).

Ms. Denney would implement the use of sign language for the Child.  (Admin. Tr. p. 110).  She would teach him to sign for the snack he chooses.  (Admin. Tr. p. 110).  She has been trained in sign language for three years.  (Admin. Tr. p. 110).  Ms. Denney believes that the Child would fit into her class.  (Admin. Tr. p. 118).  He would be in the middle of the class, not the highest student, but not the lowest either.  (Admin. Tr. p. 118).

Ms. Denney set up an area in the classroom to mirror the classroom at Heartspring for the Child.  (Admin. Tr. p. 91, 93).  There were objects hung up on the partition by his desk, like a clip, spoon, poker chips, and a toothbrush.  (Admin. Tr. p. 91).  Ms. Denney set up his area this way so that the Child would feel comfortable.  (Admin. Tr. p. 91).  Ms. Denney's goal is to have the Child isolated for a short period of time and then move him to where he would be a part of the class.  (Admin. Tr. p. 91).

A behavior chart is posted on the wall.  (Admin. Tr. p. 82).  If a student is behaving, there is a happy face on the chart.  (Admin. Tr. p. 82).  At the end of the day, the students can cash in their happy faces for candy, snacks or toys from a goody box.  (Admin. Tr. p. 82).

The students leave the classroom and go to the cafeteria for lunch.  (Admin. Tr. p. 97).  They obtain lunch the same way as all the other students.  (Admin. Tr. p. 97).  The students go to the

auditorium for assemblies and certain games. (Admin. Tr. p. 98). The students go the media center to choose books, check them out, and return them. (Admin. Tr. p. 98). They go to the gymnasium or outside for physical education. (Admin. Tr. p. 105). The class also goes on many field trips. (Admin. Tr. p. 106). They go to the pool or the beach a few times a year. (Admin. Tr. p. 106).

Patrick McGreevy, Ph.D. provided a Behavior Analysis Consultation for the School Board at the hearing before the ALJ. (Doc. 50, Exh. 5). Dr. McGreevy observed the Child at Heartspring. (Doc. 50, Exh.5, p. 1). He found the staff to be pleasant and the Child enjoyed interacting with the staff. (Doc. 50, Exh. 5, p. 1). After observing the Child on several occasions, Dr. McGreevy concluded that the Heartspring program was a pleasant and supportive residential and educational program for students with needs similar to the Child. (Doc. 50, Exh. 5, p. 2). He found the program to have certain "exemplary components" such as the "Murdock prompting procedures and the self-graphing data sheets." (Doc. 50, Exh. 5, p. 2). These components assure that the Child will be able to complete daily living skills without vocal prompts. (Doc. 50, Exh. 5, p.2). Dr. McGreevy found the Heartspring program to be lacking in communication and language components. (Doc. 50, Exh. 5, p.2). Dr. McGreevy determined that the block system used at Heartspring does not provide expressive communication skills and no acquisition of language. (Doc. 50, Exh. 5, p. 2). He determined that without this expressive communication skills, certain problem behaviors such as ear flicking which may be an attempt to communicate would become even more difficult to manage and may become more frustrating for the child. (Doc. 50, Exh. 5, p. 2). Dr. McGreevy also found a deficiency in the Heartspring's program regarding managing resistance to instruction. (Doc. 50, Exh. 5, p. 3). He asserted that Heartspring does not implement the "state-of-the-art" teaching procedures, and made suggestions of some methods that "would improve the program immeasurably" for the Child.

(Doc. 50, Exh. 5, p.3).   Dr. McGreevy determined that the Child's needs were not being met at Heartspring with respect to communication and problem behaviors, and he opined that these needs could be met in a "state-of-the-art" program in the Lee County School District where he has been providing training to the ESE staff.  (Doc. 50, Exh. 5, p. 3).  Dr. McGreevy suggested that the Child be placed in this type of program or a similar one that emphasizes expressive communication and language, and "provide a complete analysis of resistance to instruction and 'flicking', along with scientifically validated teaching and behavior management procedures."  (Doc. 50, Exh. 5, p. 3).

Marsha Vollmar testified at the Due Process hearing.  Ms. Vollmar is employed as the program administrator for the Agency for Persons with Disabilities.  (Admin. Tr. p. 206).  Ms. Vollmar administers services for the disabled in a five county area including Lee County.  (Admin. Tr. p. 207-208).  If the custodial parent of a child with autism receives a Medicaid Waiver, the custodial parent would receive services for the child, and these services would be funded by the federal and state governments.  (Admin. Tr. p. 208).   There are many services available for children with autism including respite care, personal care assistance, behavioral analysis, as well as other services.  (Admin. Tr. p. 209-10).  This Agency can provide residential placement if necessary.  (Admin. Tr. p. 216).

Terese Conrad, a speech language therapist for the Child at Heartspring testified at the Due Process Hearing.  (Admin. Tr. p. 467, 480, 481).  Ms. Conrad testified that when the Child arrived at Heartspring he was nonverbal, wanted to be wrapped in a blanket and was not willing to use his hands other than to hurt himself or occasionally take food.  (Admin. Tr. p. 480).  At the IEP meeting on May 25, 2004, Ms. Conrad stated that there was a disagreement as to the use of objects to communicate versus the use of sign language.  (Admin. Tr. p. 483).  Ms. Conrad testified that for nonverbal students, communication is broken down into the lowest level which is concrete objects, then it progresses to

pictures, and then to verbal speech. (Admin. Tr. p. 483). Ms. Conrad found that it was appropriate to use symbols for the Child's expressive and receptive language. (Admin. Tr. p. 484). At the IEP meeting, no one from Heartspring proposed that the Child be moved from there. (Admin. Tr. p. 488). The Child was stable at Heartspring when Ms. Conrad left Heartspring in July 2004. (Admin. Tr. p. 494). Ms. Conrad testified that the Child needs consistency to obtain educational benefit. (Admin. Tr. p. 497). Ms. Conrad found that the Child needs multiple repetitions to learn, which would include instruction beyond the normal school day. (Admin. Tr. p. 497). Ms. Conrad provided services during the school day and in the group home. (Admin. Tr. p. 500). The Child showed signs of aggression in the classroom by screaming, pinching or scratching. (Admin. Tr. p. 503). The Child engaged in dropping, elopement, masturbation, stripping, property destruction, and ear hitting. (Admin. Tr. p. 504, 510, 511, 512 ).

### III.  Placement of the Child

Although the Parent raises other procedural defects in the IEP dated May 25, 2004 and June 25, 2004, the main issue in this case, as it was in the prior case, is the placement of the Child. The Parent argues that the Child will not receive educational benefit unless he is placed in a residential facility and the School Board asserts that the Child will receive an appropriate education at Diplomat.

The IDEA provides that the education of a student will be provided whenever possible in a regular public school, with the child participating in the regular activities of non-handicapped children as much as possible. *M.M. v. School Board of Miami-Dade County, Florida*, 437 F.3d at 1096. However, the IDEA also provides "for placement in private schools at public expense where this is not possible. *Id*. (citing, *Loren F. v. Atlanta Independent School System*, 349 F.3d 1309, 1312 (11th Cir.

2003).  To meet the FAPE requirements, a child must be educated in the least restrictive environment possible.  20 U.S.C. §1412(a)(5).  "To the maximum extent appropriate," a child must be educated with children who are not disabled, and disabled children must not be separated from "the regular educational environment" unless "the nature or severity of the disability of a child is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily." 20 U.S.C. §1412(a)(5).  If the School Board is unwilling or unable to provide appropriate special education, then the IDEA provides that the cost of a private school may be reimbursed if the public school did not make FAPE available to the child.  *Loren F. v. Atlanta Independent School System*, 349 F.3d at 1312, 20 U.S.C. §1412(a)(10)(C)(ii).

The law has not changed from the prior case, and the Court relies on the same cases as previously cited.  "Despite the statutory preference for mainstream placements, the IDEA recognizes that some disabled students need full-time care in order to receive educational benefit."  *Independent School District No. 284 v. A.C.*, 258 F.3d 769, 774 (8th Cir. 2001).  The statute and regulations included full-time care as an option for students by defining the term "special education" to mean instruction in hospitals and institutions.  20 U.S.C. 1401(24) and 34 CFR 300.26(a)(i).  "Thus the IDEA requires that a state pay for a disabled student's residential placement if the student, because of his or her disability, cannot reasonably be anticipated to benefit from instruction without such a placement."  *Independent School District No. 284 v. A.C.*, 258 F.3d at 774.  A court must determine whether the child is receiving educational benefit to determine the extent of a school board's obligations under the IDEA.  *Gonzalez v. Puerto Rico Department of Education*, 254 F.3d 350, 352 (1st Cir. 2001)  A school district is not required to support a disabled child in a residential program "'simply to remedy a poor home setting or to make up for some other deficit not covered by the Act.

It is not the responsibility of local officials under the Act to finance foster care as such: other resources must be looked to.'" *Id.* at 353, (citing *Abrahamson v. Hershman*, 701 F.2d 223, 227-28 (1ˢᵗ Cir. 1983)).   However, courts have held that the state is responsible for the costs of a residential program when "'medical, social or emotional problems that require hospitalization create or are intertwined with the educational problems.'" *Mrs. B. v. Milford Board of Education*, 103 F.3d 1114, 1120 (2ⁿᵈ Cir. 1997), (citing *Vander Malle v. Ambach*, 667 F.Supp. 1015, 1039 (S.D. N.Y 1987)), See, 34 C.F.R. §300.302.  A school board is not required to "maximize" a child's education so that the child can reach his potential, but rather must provide an "appropriate" education and some environments are not suitable for a disabled child to receive an appropriate education.   *Mrs. B. v. Milford Board of Education*, 103 F.3d at 1122.   "In deciding if a school must fund a residential placement, the court must determine whether the child requires the residential program to receive educational benefit." *Id.*, (citing *Abrahamson v. Hershman*, 701 F.2d at 227-228).  A court must consider whether a child can receive educational benefit outside of a residential program.  *Independent School District No. 284 v. A.C.*, 258 F.3d at 777.

"The fact that a residential placement may be required to alter a child's regressive behavior at home as well as within the classroom, or is required due primarily to emotional problems, does not relieve the state of its obligation to pay for the program under federal law so long as it is necessary to insure that the child can be properly educated." *Mrs. B. v. Milford Board of Education*, 103 F.3d at 1122.  The IDEA does not require that a child spend years in an educational environment that is not appropriate just to allow a school district to try every option short of residential placement.  *Seattle School District, No. 1 v. B.S.*, 82 F.3d 1493, 1505 (9ᵗʰ Cir. 1996).

The School Board's position is that the Child should be transferred to Diplomat to attend special education classes at a regular school, and that there are services that the community can provide to the parents to help with the issues of care for the Child before and after school. The Parent contends that the Child will not have the consistency he needs to receive educational benefit if he is not in a residual program that provides this consistency throughout the day and night. These arguments are very similar if not the same as the arguments made in the prior case regarding the Child. Just as in the earlier case, the proper placement of the Child is a very difficult decision. It is undisputed that the Child is making educational progress at Heartspring. It is very clear from the proposed IEP that Heartspring developed for the Child that he is receiving educational benefit from the Heartspring program. The issue is whether the Child can receive some educational benefit from the Diplomat program.

The Court recognizes that IDEA does not require that the Child be placed in the best program to maximize his potential, but rather an educational program that is sufficient for the Child to obtain some educational benefit. The program at Diplomat appears to be a wonderful program for a child with autism. However, even though the program obviously would provide some instruction while the Child is at the school, the real issue is when the Child leaves the school, will all of the instruction be lost because it is not being reinforced with consistency throughout the Child's entire day. The School Board has not provided any evidence or even any information that will assure the Court that once the Child leaves his structured school day at Diplomat that any of the lessons he learned will stay with him while he is away from the school. The School Board did provide testimony that services are available to the Child and the Parent from the community such as respite care, care with bathing, and so on, but there was no testimony that there would be a consistency throughout the day and night that would

afford the Child some educational benefit.  The Court is impressed by the educational benefit that the Child is receiving at Heartspring.  The Child arrived at Heartspring preferring to be wrapped in a blanket and not use his hands.  He has progressed far beyond that point and is swimming, walking on a treadmill, and has some very basic communication. However, his maladaptive behaviors such as ear-flicking continue and some new maladaptive behaviors have formed.

Dr. McGreevy testified that the teaching method at Heartspring was not the most progressive and that the Child was lacking in expressive communication, language, and resistance to instruction. Although his analysis might be helpful to his teachers, the Court is not required to provide the best program for the Child and as stated above, the Child has received educational benefit at Heartspring. Further, a court must not impose its view of a preferable education method on the State.  *Rowley,* 458 U.S. at 206.  Courts lack the specialized knowledge and experience necessary to resolve difficult questions of educational policy.  *Id.* at 208.  A parent does not have the right to compel a school district to provide a specific program or employ a specific methodology to educate a child.  *Lachman v. Illinois State Board of Education*, 852 F.2d 290, 297 (7th Cir. 1988) *cert. den.*, 488 U.S. 925 (1988). Therefore, the School Board has the primary responsibility for formulating an educational program for the Child.  *Rowley*, 458 U.S. at 207.  The Court accepts Dr. McGreevy's testimony that some other type of methodology may be better for the Child.

However, the issue for the Court is not whether Heartspring provides the best methodology, but rather whether residential placement is needed for the Child to obtain educational benefit.  Dr. McGreevy did not address how the lack of consistency in the Child's entire day from school to home would impact the Child's education.  At a residential facility, the Child would receive consistent education throughout the day that would be reinforced when outside of the classroom.  For the Child

to receive educational benefit, the Court finds that the consistency of a residential facility is needed. There is no evidence that without consistency, the Child can overcome or even decrease his maladaptive behaviors which interfere with his educational progress. The Court recommends that the Child remain in a residential facility, but makes no recommendation as to whether Heartspring is the correct residential facility for the Child. The Court affirms the decision of the ALJ for the continued placement of the Child in a residential facility.

**IV. Alleged Procedural Defects in the IEP dated May 25, 2004 and June 25, 2004**

The Parent and Child assert that the IEP dated May/June 2004 does not meet the requirements of the statute. The ALJ determined that the only IEP at issue in this matter was the one developed in May and June 2004 by the School Board (not the one developed by Heartspring). (Final Order, p. 17). The IEP team convened on May 25, 2004 and June 25, 2004 to prepare a new IEP for the 2004-2005 school year. (Pet. A-3-1-16). The meeting occurred at Heartspring. (Final Order, p. 17). The placement for the Child in this proposed IEP was Diplomat Middle School, a public school in Lee County, Florida. (Pet. A-3-16). By letter dated November 24, 2004, the Parent requested a due process hearing pursuant to the IDEA and other statutes and also requested a "stay put" at the Heartspring facility. (Pet. G-13-1). The due process request claimed that the School Board failed to provide FAPE in the following manner:

1) failing to provide notices to the Parent

2) failing to produce timely the Child's educational records

3) failing to list objective and measurable present levels of performance in the IEP

4) failing to list objective and measurable goals in the IEP

     5) failing to list objective and measurable short-term objectives, milestones, or benchmarks

     6) failing to include evaluation criteria

     7) failing to include dates of initiation and duration of services

     8) failure to include appropriate transitions and services

     9) proposing to change the Child's educational placement from residential to a school based setting

     10) failing to develop an appropriate transition plan

(Pet. G-13-2-3).

The Parent argues that the IEPs contain a number of procedural violations. An IEP will not be automatically rendered legally defective if it contains procedural flaws. *Roland M. V. Concord School Committee*, 910 F.2d 983, 994 (1st Cir. 1990) An IEP will be set aside for procedural violation only if there is a rational basis to believe that the procedural inadequacies have compromised the student's right to an appropriate education, or have seriously hampered the parents' opportunity to participate in the formulation of the IEP or caused a deprivation of educational benefits. *Hampton School District v. Dobrowolski*, 976 F.2d 48, 54 (1st Cir. 1992), citing *Roland M. v. Concord School Committee*, 910 F.2d 983 (1st Cir. 1990) The parents bear the burden of proving that the procedural flaw harmed the child. *Roland M.*, 910 F.2d at 995.

**A. Requirements of an IEP**

An IEP must meet the following procedural requirements set forth in 20 U.S.C. §1414(d)(1)(A):

     The term "individualized education program" or "IEP" means a written statement for each child with a disability that is developed, reviewed, and revised in accordance with this section and that includes --

(i) a statement of the child's present levels of educational performance, including --

(I) how the child's disability affects the child's involvement and progress in the general curriculum . . .

(ii) a statement of measurable annual goals, including benchmarks or short-term objectives, related to –

(I) meeting the child's needs that result from the child's disability to enable the child to be involved in and progress in the general curriculum; and

(II) meeting each of the child's other educational needs that result from the child's disability;

(iii) a statement of the special education and related services and supplementary aids and services to be provided to the child, or on behalf of the child, and a statement of the program modifications or supports for school personnel that will be provided for the child –

(I) to advance appropriately toward attaining the annual goals;

(II) to be involved and progress in the general curriculum in accordance with clause (i) and to participate in extracurricular and other nonacademic activities; and

(III) to be educated and participate with other children with disabilities and nondisabled children in the activities described in this paragraph; . . .

(vii)(I) beginning at age 14, and updated annually, a statement of the transition service needs of the child under the applicable components of the child's IEP that focuses on the child's courses of study (such as participation in advanced-placement courses or a vocational education program);

(II) beginning at age 16 (or younger, if determined appropriate by the IEP Team), a statement of needed transition services for the child, including when appropriate, a statement of the interagency responsibilities or any needed linkages; . . .

(viii) a statement of --

(I) how the child's progress toward the annual goals described in clause (ii) will be measured; and

(II) how the child's parents will be regularly informed (by such means as periodic report cards), at least as often as parents are informed of their nondisabled children's progress, of —

(aa) their child's progress toward the annual goals described in clause (ii); and

(bb) the extent to which that progress is sufficient to enable the child to achieve the goals by the end of the year.

The Regulations provide further guidance as to the content of the IEP.  The IEP must contain "[a] statement of the child's present levels of educational performance, including -- (i) How the child's disability affects the child's involvement and progress in the general curriculum (i.e., the same curriculum as for nondisabled children.)"  34 C.F.R. §300.347(a)(1).  The IEP also must include "[a] statement of measurable annual goals, including benchmarks or short-term objectives, related to -- (i) Meeting the child's needs that result from the child's disability to enable the child to be involved in and progress in the general curriculum (i.e. the same curriculum as for non-disabled children) . . . (ii) Meeting each of the child's other educational needs that result from the child's disability."  34 C.F.R. §300.347(a)(2).  In addition, the IEP must contain a statement of "[h]ow the child's progress toward the annual goals described in paragraph (a)(2) of this section will be measured" and how the parents of the child will be kept informed of the progress of the child.  34 C.F.R. §300.347(a)(7). The Regulations also provide that transition services must include "[f]or each child 16 (or younger, if determined appropriate by the IEP team), a statement of needed transition services for the student, including, if appropriate, a statement of the interagency responsibilities or any needed linkages."  34 C.F.R. §300.347(b).

**B. Notice to Parent; and Educational Records**

The Parent asserts that she and S.S. (the Child's father) did not receive notice of the IEP meeting and were unable to make travel arrangements to Wichita to participate in the IEP meeting. They were unaware of the draft IEP or the reports considered by the other participants at the IEP meeting on May 25, 2004.  In addition, the Parent claims that the School Board did not provide all of the Child's educational records which were requested by the Parent.  The Parent must show that she was hampered in her ability to participate in the formation of the IEP.

The Parent testified that she received notice of the IEP meeting in May 2004 when someone at Heartspring called her and asked if she was going to attend.  (Admin. Tr. p. 666). She received the call very close to the meeting date.  (Admin. Tr. p. 666).  She wanted to be physically present at the IEP meeting, but was unable to be present due to lack of timely notification by the School Board. (Admin. Tr. p. 667-668).  The Parent appeared by telephone for the May 2004 meeting.  (Admin. Tr. p. 669).  She had telephone problems during the hearing, and lost communication for about twenty minutes to a half an hour.  (Admin. Tr. p. 669).  She had not received any reports prior to the meeting. (Admin. Tr. p. 669).  The Parent did attend the June 25, 2004 IEP meeting in person.  (Admin. Tr. p. 686).   The Parent never received access to the Child's educational records prior to the IEP meeting. (Admin. Tr. p. 675).  Some of these records were evaluations of the Child.  (Admin. Tr. p. 675).

Although from the testimony it shows that the Parent did not receive notice from the School Board and did not receive copies of educational records, it is clear that the Parent participated in both the May and June 2004 IEP meetings.  The Parent's concerns were listed in the proposed IEP.  (Pet. Exh. A-3-1).  The Parent was concerned about consistency in the Child's education and she wanted him to continue making progress.  (Pet. Exh. A-3-1).  The Court does not condone the actions of the School Board by not providing notice and copies of the records, however, there was no evidence that the Parent or S.S. was hampered in their ability to participate fully in the IEP meeting.

**_____C.  Present Levels, Short-Term Objectives, Annual Goals**

The Parent claims the May/June 2004 IEP did not meet the requirements for an IEP because the present levels of performance were not written in objectively measurable terms and were not related to other components of the IEP.  The Parent claims that the short-term objectives and annual goals did not meet the requirements of the IEP in that they bore no relationship with the present levels

-23-

of performance. The present levels of performance were detailed as to the present levels of the Child.

As an example, one of the present levels involved tooth brushing and the goal was to have the Child

participate in the tooth brushing process and brush certain areas 80% of the time.  The short-term

objectives then went into great detail as to specific teeth and the brushing motion. The present levels

were related to other components of the IEP and have goals within them.  The Court finds the present

levels of performance to be sufficient.  The annual goals and short-term objectives relate to his present

levels of performance and set goals for the Child in the future.  They are detailed and measurable.  The

Court finds the Short-Term Objectives and Annual Goals to be sufficient.   The Court finds no

procedural inadequacies regarding the present levels, short-term objectives and annual goals.

### D.  Evaluation Criteria

The Parent argues that the Child should have received an Independent Educational Evaluation

("IEE"), citing to 20 U.S.C. §1415(b)(1) and 34 C.F.R. §300.502(b)(1).  The School Board asserts

that the Parent did not request with clarity the independent evaluations that she wanted conducted.

In a letter dated October 8, 2004, the Parent through her attorney wrote a letter to Terry Andrews,

the Director of E.S.E. Services for the School Board.  (Pet. G-8-1).  In the letter, counsel states,

"[f]urther, my clients do not believe the Lee County School District reached the correct conclusions

or administered the proper, unbiased evaluation, or misinterpreted the evaluation administered and

therefore request independent evaluations." (Pet. G-8-1).  In response, counsel for the School Board

sent a letter to counsel for the Parent and Child stating that the School Board needs

> further information regarding your request for 'independent evaluations.'  In a single
> statement you have stated disagreement with the conclusions reached, as well as the
> propriety, administration and interpretation of unspecified evaluations, and requested
> independent evaluations.  Please specify the evaluation(s) you wish to have performed
> independently, so that we can properly and effectively respond to the request.

(Pet. G-11-2).  The ALJ found the School Board should have initiated an IEE or requested a due process hearing.  (Doc. 1, Final Order, ¶105).  Upon review of this case,  independent evaluations would have been very beneficial, however, from a procedural standpoint, the Parent's request may have been too vague for the School Board to act upon.  When the School Board asked for clarification, the Parent ignored the request.  The Court determines that the Parent's request for independent evaluations was not clear enough for the School Board to act on the request, and when the School Board asked for clarification, it received no response.  The Court finds no procedural flaws with the School Board failing to initiate an IEE from the vague request by the Parent in October 2004.

Later, the School Board attempted to arrange an IEE, but the parties, as they had done many times before, became embroiled in a dispute as to who was the appropriate person to conduct the IEE. The School Board located Dr. Mitchel Woltersdorf near Heartspring, and made the arrangements to transport the Child to his office.  The Parent objected insisting that the evaluation be conducted by someone in Cleveland, Ohio or Fort Myers, Florida.  The School Board declined this request.  The Court finds that if the parties could have reached some compromise, the Child would have received a needed IEE, however, they could not.  The Court again does not condone the School Board's actions, but finds no procedural flaw with the School Board's conduct.

### E.  Initiation and Duration of Services

The Parent asserts that the IEP must contain specific special education and related services. The Parent argues that the amount of services must be stated clearly in the IEP for both development and implementation of the IEP.  The Parent asserts that the level of services for occupational therapy, adapted physical education and speech/language were written in vague terms, and contrary to the Child's needs.  The IEP provides for language therapy, occupational therapy and adaptive physical

education for the same duration as the Child had at Heartspring.  (See, Pet. A-3-16).  These services were for instruction in functional academics, daily living skills, communication, and behavior.  The Court finds no procedural inadequacies in the initiation or duration of other services.

### F.  Transition Services and Plan

The Parent asserts that the IEP is lacking in transition services from Heartspring to Diplomat.[9] The Parent does not cite to a regulation that requires transition services be a part of an IEP.  It appears that the main arguments made are that the Child should not be transferred to Diplomat from Heartspring.  The Court found that a residential facility was appropriate for the Child so many of the arguments have been addressed already.  The Court determines that the IEP was not procedurally inadequate regarding transition services.

### G.  Behavior Plan

The Parent asserts that the IEP is deficient in that it does not have a behavior support plan. The Parent failed to cite a requirement that an IEP contain a behavior support plan.  However, a Positive Behavior Support Plan was included in IEP which also includes a reference to the Heartspring Behavior Support Plan. (Pet. A-3-13).  The IEP also included a Behavior Goal/Replacement Behavior Plan. (Pet. A-3-14).  Both of these documents discuss inappropriate behaviors and provide a plans for handling them.  The Court determines that the IEP was not procedurally inadequate in not having a behavior support plan.

### H.  Impact on FAPE

---

[9]  The School Board discusses transition services for the proposed transfer from Heartspring to Diplomat and also, a transition plan for the Child who was nearing his 14th birthday at the time of the June 25, 2004 IEP meeting.  The Parent only raises the transition services regarding a transfer from Heartspring to Diplomat, and therefore, the Court will address only this proposed transition.

The Court finds that other than the issue of placement, the May/June 2004 IEP was not procedurally deficient. Therefore, the procedural issues raised have no impact on the Child's right to FAPE.

## V. Conclusion and Recommendation

With the exception of the placement issue, the May/June 2004 IEP for the Child was reasonably calculated to provide the Child an educational benefit which would allow him to progress in school and in life according to his abilities and capacities. The Court finds that the May/June 2004 IEP is reasonably calculated to provide the Child with FAPE. The Court overrules the ALJ regarding procedural deficiencies in the May/June 2004 other than with regard to placement.

The Court finds that the School Board has failed to show that a school-based placement such as Diplomat Middle School would provide educational benefit to the Child. Further, the School Board failed to prove that the May/June 2004 IEP could be fully implemented at Diplomat Middle School. The Court finds that a residential program is an appropriate placement for the Child to allow him to obtain educational benefit. The Court respectfully recommends the following:

1) The District Court find for E.S. individually and on behalf of B.S., a minor on the Complaint;

2) The District Court find for E.S. individually and on behalf of B.S., a minor on Count II of the Counterclaim as to placement in a residential facility; and for the School Board of Lee County, Florida as to the other procedural deficiencies in the May/June 2004 IEP.

3) The Child be placed in a residential program to allow the Child to receive educational benefit.

4) The School Board bear the costs of the residential program.

5) The District Court find for E.S. individually and on behalf of B.S., a minor on Count I of the Counterclaim, and allow E.S. individually and on behalf of B.S. to file a motion for attorneys fees and costs as the prevailing party on the predominant issue, the placement of the Child.

Failure to file written objections to the proposed findings and recommendations contained in this report within ten (10) days from the date of its filing shall bar an aggrieved party from attacking the factual findings on appeal.

Respectfully recommended in Chambers in Ft. Myers, Florida this ___27th___ day of August, 2007.

DOUGLAS N. FRAZIER
UNITED STATES MAGISTRATE JUDGE

Copies: All Parties of Record